**SCHICK SERVICE, Inc. et al. v. JONES.**

**JONES v. SCHICK SERVICE, Inc., et al.**

**No. 11854.**

United States Court of Appeals
Ninth Circuit.

March 18, 1949.

Rehearing Denied May 17, 1949.

970

Leonard S. Lyon, Frederick W. Lyon and Alexander MacDonald, all of Los Angeles., Cal., for Schick-Service and Schick, Inc.

Harris, Kiech, Foster & Harris and Ford W. Harris, Jr., all of Los Angeles, Cal., for Ralph E. Jones.

Before MATHEWS and STEPHENS, Circuit Judges, and DRIVER, District Judge.

STEPHENS, Circuit Judge.

Schick Service, Inc., defendant, appeals from an interlocutory judgment of the district court holding valid and infringed certain claims[1] under a United States Letters Patent No. 2,228,768 granted January 14, 1941, to Ralph E. Jones, plaintiff, for hair clipping and shaving device improvements, and from an injunction and an order of accounting. Jones brings a cross-appeal from that portion of the judgment holding certain of the claims to be invalid,[2] and from the dismissal of the second cause of

[1] The four claims upheld as valid and infringed by Schick consisting of combination claims are:

"22. A device of the class described having an open-ended channeled head, and rounded guard elements hinged to the device at the opposite ends of said head.

"23. A device of the class described including a handle, an open-ended channeled head, a cutter within the head, and rounded guard elements at the open ends of said head, said elements being hinged to said handle.

"31. An electric razor structure having a head provided with a chamber opening through the respective opposite ends of the head, and end flaps for said chamber hinged to said structure adjacent said ends of the head.

"32. An electric razor structure having a head provided with a chamber opening through the respective opposite ends of the head, and end flaps for said chamber hinged to said structure adjacent said ends of the head, said end flaps having rounded upper sections form-ing rounded end extensions and bearing surfaces for the razor head."

[2] Those claims which were held invalid because of indefiniteness (claims 17, 18, 19, 20, 24 and 25 were also held invalid, but are not in issue on this appeal) are:

"1. A hair clipping device of the character described, including an outer transversely slitted channeled head and a cutter reciprocating within the channel of the head, the head at its longitudinal outer edges being transversely rounded, the transversely rounded surfaces merging into the outer surface of the head, and elements disposed at the ends of the channeled head, each having a longitudinally rounded surface at its extremity merging into the outer surface of the head at the ends thereof.

"11. A hair clipping device including a handle, a transversely slitted channeled head mounted on the handle and having a flat outer surface, a cutter reciprocating within the channel of the head, and elements carried by the handle and disposed at the ends of the head, each having a

action based on an oral contract of license. We will refer to defendant and plaintiff as Schick and Jones respectively.

The patent involved certain alleged improvements in the Schick type electric shaver by adding "end-guards" or "flaps" hinged to a handle of the dry shaver at the ends of the cutting head thereof; and, secondly, by rounding the outer ends of the end-guards. The first objection to the original Schick razor, stated in the patent, is as follows: "Devices of this kind as placed upon the market are open to the objection that there are two relatively sharp corners on each side of the shaving head and two relatively sharp corners at the extremities of the shaving head. These corners, when the instrument is pressed against the face or other part, are annoying and uncomfortable, particularly inasmuch as the device must be pressed firmly against the face in order that it shall cut properly and make a 'clean shave'." To meet this objection the patent proposes: "Each of these guards at its outer end is rounded, * * *, so that its outer face extends longitudinally of the guard and inward towards and merges into the flat upper face of the channeled head * * *." The second objection set forth in the patent states that: "In devices of this kind, the channel-shaped head is held in place against accidental detachment by means of a set screw passing through a channel-shaped recess in the handle, which recess contains the head. Due to the very rapid vibrations given to the cutter within the head, this set screw often becomes loosened and in that case, the head is liable to fall out, carrying with it the cutter, and the cutter and head may drop against some very hard object as, for instance, a washstand, floor or the like, and damage the cutter head or the cutter itself, thus rendering the instrument impossible for use un-

rounded surface at its extremity merging into the outer surface of the head at the respective ends thereof.

"26. A hair clipping device including a handle, an outer hollow cutting head having an outer face and side faces, a movable cutter disposed within the outer head and guards mounted on the ends of the hollow outer head, each guard having a longitudinally and transversely rounded outer face merging into the outer face and the side faces of the cutter head whereby to provide rounded ends and corners for said head extending flush with the outer and side faces thereof.

"27. A hair clipping device including a handle, an outer hollow cutting head having an outer face and side faces, a movable cutter disposed within the outer head, and guards mounted on the ends of the hollow outer head, each guard having a longitudinally and transversely rounded outer face merging into the outer face and the side faces of the cutter head whereby to provide rounded ends and corners for said head extending flush with the outer and side faces thereof, each guard being relatively thick at a point coincident with the inner end of the longitudinally curved portion of its face.

"28. A hair clipping device including a handle, an outer hollow cutting head having an outer face and side faces, a movable cutter disposed within the hollow head, guards disposed on the ends of the hollow head, each guard having a longitudinally and transversely rounded outer face merging into the outer face and the side faces of the cutter head whereby to provide rounded ends and corners for said head extending flush with the outer and side faces thereof, and means for detachably locking the cutting head to the handle.

"29. A hair clipper of the character described including a handle, an outer hollow cutting head having an outer transversely slitted face and side faces, a movable cutter disposed within the hollow head, guards mounted on the head and having a longitudinally and transversely rounded outer face merging into the slitted face and the side faces of the cutter head whereby to provide rounded ends and corners for said head extending flush with the outer and side faces thereof, and means detachably holding the head in place upon the handle.

"30. A hair clipper including a handle, a hollow cutting head disposed on said handle and having a transversely slitted wall and side walls and having a base resting flat against the end of the handle, guards disposed at the ends of the cutting head, each guard being relatively thick at its outer end and transversely and longitudinally curved to merge into the outer face of the slitted wall and the outer faces of the side walls of the head whereby to provide rounded ends and corners for said head extending flush with the slitted wall and outer faces of the side walls thereof, one of said guards at its inner end being attached to the handle, and means for holding the cutting head in place on said handle."

til these parts have been replaced or duplicated at considerable expense." This objection, the patent explains, is overcome by extending the guards "across both ends of the channel-shaped head, which will hold the channel-shaped head in position without the necessity of using a set screw." Each of the guards or flaps has an opening so that a "blast of air will blow the hairs which may have collected in [the] channel * * * out through the opposite guard."

The advantages of these improvements according to the patent are: "First, comfort for the person whose beard is being clipped or shaved; Second, security against interruption of the mechanical functioning of the clipping machine; Third, security against damage to fragile and expensive parts; Fourth, ease in disassembling the parts, and Fifth, neatness in construction and appearance." A further advantageous result suggested, by the use of such rounded end-guards on a dry shaver, is that the user can obtain a much faster shave than would otherwise be possible.

The "end-guards" used by Schick are termed "whiskets" by the company and are allegedly used for whisker receptacles. The district court found that the "end-guards" and "whiskets" are used for the same purpose and accomplish the same result, i. e., shaving comfort and a faster shave and also permit ready disassembly of the shaving head and fast cleaning of the device.

Schick argues that the court erred in holding valid claims numbered 22, 23, 31 and 32, because: "(a) The invention or inventions purported to be patented had been described in printed publications prior to the supposed invention or discovery by the plaintiff; (b) That the plaintiff was not the original and first inventor of any material or substantial part of the thing claimed in said patent; (c) That the invention or inventions purported to be patented thereby did not constitute patentable novelty or invention within the meaning of the patent laws, in view of the prior state of the art, and in view of what was common knowledge on the part of those skilled in the art, prior to the date of the alleged invention or inventions of the plaintiff." Schick asserts further that their "whiskets" do not infringe as they are hair receptacles

which "are imperforate and of a shape enabling them to catch and store the hair or beard clippings. * * * They are not provided for the purpose of holding the channeled head to the handle nor to prevent scratching or cutting."

Jones urges that the claims were properly held valid in that they are not for simply "rounding" or "hinging" an old element in an old combination of elements, but each is for a new combination of elements which have new attributes and features defined by the claims. He defends the lower court's holding, arguing that this shaver structure, having end-guards hinged to the structure or handle adjacent to the ends of the cutting head, clearly defines invention and is valid over prior art. (Claim 31.) As to claims 22, 23, and 32, it is contended that the case is even stronger because these claims are limited not only to the provision of end-guards hinged to the handle, but are also limited to the end-guards being rounded. Claim 31 is not limited in terms to rounded end-guards but rather limited to a shaver structure as described. He states that "(a) It is novel and inventive in the art to provide separate end guards for the ends of the cutting head of a dry shaver, which are rounded and which conform to the general shape of the ends of the cutting head; and (b) It is novel and inventive in the art to provide separate end guards for the ends of the cutting head of a dry shaver, which are hinged to the handle of the dry shaver adjacent the ends of the head. * * * That claims 22, 23, 31, and 32 define true patentable combinations is self-evident. There can be no question that the end-guards of the patent in suit cooperate with both the cutting head and the handle of the dry shaver, being hinged to the handle and forming end extensions and bearing surfaces for the cutting head. By the provision of such end guards, the ends of the cutting head are protected against injury. By hinging the end guards to the handle, the dry shaver may be readily disassembled for cleaning and reassembled and unnecessary handling of the cutting head obviated. By rounding the end guards as described in the patent, shaving comfort is provided to the user. Thus, each of these features of construction modifies the gen-

eral function of the end guards, and each feature modifies the other."

Schick claims that the rounded guard member, a feature of the patent, is not patentable in that there is no invention. Claims 1, 11, 26, 27, 28, 29, and 30 (declared to be invalid by the trial court because of indefiniteness and because lacking in invention) he argues, describe a rounded guard member—so that this feature existing in the valid claims is not the necessary portion making for patentability. Further, the only additional feature in the valid claims was the hinging of the guard members to the handle of the razor. Hinging, it is urged, is a well-known method for attaching one device to another and is merely the result of mechanical skill, hence there is no patentability or invention to this feature; however, the lower court must have found this feature of hinging to be the essential addition making the improvements patentable in claims 22, 23, 31, and 32, which is manifestly error.

Schick further alleges that hinging is not patentable because it has been used in many prior patent devices. In the Bernard patent, United States patent No. 765,954 (although not a shaving device it is applicable to show the lack of novelty in hinging guards—the corrections in applying it to shavers are mechanical requirements) a paper punch uses a hinging of a guard for opening convenience. The guard is rounded to give a smooth surface to avoid catching upon sheets of paper.

Schick continues the argument, saying nor is the addition of rounded guards hinged on the handle to a dry shaver a patentable combination. If there is no invention in rounding off sharp edges or in hinging a guard to a device, there can be no invention in putting these two features together. This is a mere union of selected elements which may be an improvement, but not a novel idea of invention.

■ We are of the opinion that the lower court erred in finding these patent claims valid,[3] for they do not constitute invention

within patent law requirements. As stated by this circuit in Keszthelyi v. Doheny Stone Drill Co. et al., 59 F.2d 3, 8, "A mere difference or change in the mechanical construction in the size or form of the thing used, in order to obviate known defects existing in the prevous devices, although such changes are highly advantageous, and far better and more efficacious and convenient, does not make the improved device patentable. In order to be patentable, it must embody some new idea or principle not before known. It must, as before stated, be a discovery, as distinguished from mere mechanical skill or knowledge."

■ The patent here embodies "mere mechanical skill or knowledge." The exhibits before the court illustrate the point that the rounding and use of guards on sharp corners of shaving instruments is not new. The fact that they had not as yet been applied to the electric dry shaver is not material. The hinging of the guard to the razor body cannot be said to be a patentable feature, nor can it be said that putting these features together in combination form satisfies patent requirements. See Monckmeier v. Erie Mfg. Co., 7 Cir., 98 F.2d 369, holding that hinging is not invention.

Jones, himself, views his invention as nothing more than a combination of hinging rounded end-guards to the handle: "It will thus be appreciated that in the invention of the patent in suit the provision of separate end guards which are rounded to increase shaving efficiency and to provide shaving comfort and to thereby reduce the shaving time of the user is of paramount importance but that the patented construction also derives additional important advantages by mounting the end guards on the handle and by hinging them to the handle."

■ Rounding off and hinging devices, even though useful, are not new, and the combination in the manner of the instant patent was purely a mechanical improvement which expresses no patentable quality. These devices are well known in the

---

[3] "I do not think there is any question here but what the improvements stated in the patent in suit are novel as applied to a shaver and are useful. It is a debatable question whether they embody invention but, in combination, I find that with respect to claims 22, 23, 31, and 32, the improvements which are described are not only novel and useful but do embody invention."

art for improvement of razors generally.[4] Nor is the fact that there is widespread use of the elements of the patented device as combined therein conclusive of its patentable novelty—it may be merely evidence of utility.[5] Jones' argument of use and commercial success is of no avail. Even though the functions performed by the combination be new and useful, this does not make the device patentable, for it must also be invention and/or discovery. There must be ingenuity over and above mechanical skill. These features have been used in a similar fashion in earlier patented devices.[6] They constitute an application of known features through mechanical skill or ingenuity to an electric razor of the Schick type. "The patented device results from mere aggregation of two old devices, and not from invention or discovery. * * * On the records before us, it is impossible to hold that production of the patented device required more than mechanical skill and originality attributable to those familiar with the art * * *." Toledo Pressed Steel Co. v. Standard Parts, Inc., 307 U.S. 350, 356, 59 S.Ct. 897, 899, 83 L.Ed. 1334.

Jones argues that there is no prior art of record in this case which shows or suggests the provision of separate end-guards for any shaving or hair clipping or cutting device, which are rounded to conform to the general shape of the ends of a cutting head of the device, and objects to references made by Schick.[7] However, in the Peterson patent, already referred to, there is a

---

[4] In Mettler v. Peabody Engineering Corp., 9 Cir., 77 F.2d 56, 57, the court states: " * * * 'That the new combination accomplishes a better result does not alone evidence invention. "The union of the selected elements may be an improvement upon anything the art contains, but, if, in combining them, no novel idea is developed, there is no patentable invention, however great the improvement may be." * * *'" And from the same case, " * * * we have merely a combination of a number of old elements producing the same result produced by prior burners clearly anticipated by prior patents and by burners used in the art."

The court states in Elite Mfg. Co. v. Ashland Mfg. Co., 6 Cir., 235 F. 893, 895, quoted by this circuit in Ray et al. v. Bunting Iron Works, 4 F.2d 214, 215, " 'The various elements shown in plaintiff's patent and mentioned in its respective claims are all found in the prior art, performing respectively the same function in the same way and producing the same result as in plaintiff's device. We are not unmindful that to combine old parts in such manner as to produce a new result by their harmonious co-operation may be patentable; but where the combination is not only of old parts, but obtains old results, without the addition of any new and distinct function, it is not patentable. There is no invention in merely selecting and assembling, as Burkholder did, the most desirable parts of different mechanisms in the same art, where each operates in the same way in the new device as it did in the old, and effects the same results.' "

[5] Eagle et al. v. P. & C. Hand Forged Tool Co., 9 Cir., 74 F.2d 918. In Grayson Heat Control, Ltd., v. Los Angeles Gas Appliance Co., Inc., 9 Cir., 134 F.2d 478, 481, "Lack of novelty and lack of invention being clearly shown, no significance attaches to the fact, if it be a fact, that utility resulted and commercial success followed from what Grayson did."

In R. G. Le Tourneau, Inc., v. Gar Wood Industries, Inc., 9 Cir., 151 F.2d 432, 435, it is said, quoting Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, at page 91, 62 S.Ct. 37, at page 41, 86 L.Ed. 58, " 'A new application of an old device may not be patented if the "result claimed as new is the same in character as the original result" ' * * even though the new result had not before been contemplated.' "

[6] See Dean Patent, No. 2,014,882 (Hair Clipper); Peterson Patent, No. 1,744,280 (Safety Razor); Ventimiglia Patent, No. 1,801,889 (Safety Razor); Friedman Patent, No. 1,516,635 (Hair Gauge Clipper); Szabo Patent, No. 1,175,023 (Hair Cutting Instrument).

[7] From Jones' brief: "Defendants rely heavily upon the ancient 'conductor's' punch, shown in the Bernard patent [Exhibit L-19], the McGill catalogue [Exhibit M], and illustrated by the sample punch [Exhibit N]. Such art does not relate to shaving or clipping devices, and there is no suggestion in it that the punch receptacles thereof could be used in any way with a dry shaver. As a matter of fact, such punch receptacles could not be used on a conventional dry shaver to accomplish the purpose of the patent in suit without substantial changes not suggested in the art. For example, in the Bernard patent the receptacle L is provided with a sharp 'projecting flange or lip P', which could not be used on a dry shaver as it would increase the dis-

rounded end-guard to provide shaving comfort.

And, although integral with the body portion in the Peterson patent, the Dean patent also suggests the idea of forming a separate end-guard. Hinging the guards to the shaver is simply a mechanical device, and as stated by the patent itself it is not a necessary or restrictive element: "While I have described both guards * * * as being hinged or pivoted by means of the pivot pins * * *, I do not wish to be limited to this as it is obvious that one of these guards, or both of them, might be permanently fixed in closed position and rigidly attached to the handle."

The alleged oral contract of license, in the second cause of action began with negotiations between Jones and members of the Schick company for the purchase of the patent from Jones. The latter refused, so it was arranged that some sort of a licensing agreement be worked out. An oral contract was agreed to and there is evidence that the Schick representatives advised Jones to make any suggestions he wished as to further terms by letter, and upon receipt thereof they would prepare a written draft for signature by both parties. The oral agreement was confirmed by Jones in a letter the next day in which he enclosed his own draft of the agreement. Schick replied and asked about one of the terms, which Jones immediately answered. Jones had two pending patent applications relating to dry shavers before the patent office at the time of these negotiations, and Schick asked Jones to send copies of the applications to them, which he did. In a letter approximately six weeks later, Schick terminated all further dealings and manufactured dry shavers, adding the improvements without paying royalties.

The trial court found that an oral contract had been consummated, whereby Jones granted an exclusive license for the life of the patent and Schick company agreed to pay $30,000 in cash as an advance on future royalties and agreed to pay Jones a royalty of $1\frac{1}{2}$ per cent of its sales price on all dry shavers sold until $250,000 was paid and then to reduce the rate to 1 per cent.

The court also found that the contract was unconditionally agreed to on January 29, 1941, and was not dependent upon the making of any subsequent agreement as to further terms nor upon being subsequently reduced to writing. Further, that the defendant Schick did not perform any of its obligations under the contract and that it breached and repudiated the agreement whereas plaintiff offered to perform, but defendant refused to accept performance. Also, defendant renounced and abandoned the contract of license on or about March

---

comfort of the conventional shaver. Furthermore, in none of the art is there any question of comfort to the user, and any rounding of the punching receptacle is purely incidental. Also, in none of such art is there any conformity of the outline of the punching receptacle to the outline of any other element. Furthermore, in none of such art is the punching receptacle hinged to a handle of the punch, in each case being connected merely to the punch jaws.

"Defendants also rely heavily upon the Peterson patent [Exhibit L-4] which shows an ordinary safety razor of the Gillette type. What this has to do with the invention of the patent in suit we cannot conceive. The Peterson patent, obviously, does not show a dry shaver, or anything that could be put upon a dry shaver to accomplish the purpose of the invention here in suit. Certainly, the curved top 1 of the Peterson patent could not by any stretch of the imagination be applied to a dry shaver. The Peterson patent, obviously, does not show or suggest separate rounded end guards disposed at each end of the cutting head of a dry shaver, which are hinged to the handle thereof.

"The patents to Friedman [Exhibit L-6], Szabo [Exhibit L-7], and Dean [Exhibit L-8] all relate to hair clipping or cutting devices, none of which shows or suggests the provision of separate rounded end guards for the cutting head of a dry shaver, and none shows or suggests plaintiff's conception of hinging such end guards to the handle of such a dry shaver

"The patent to Ventimiglia [Exhibit L-5] likewise has no pertinency, merely showing a tubular clipper for nostril hairs. Plainly, it does not show or suggest the use of separate end guards on a conventional dry shaver at each end of the cutting head, or that such end guards should be rounded, or that such end guards should be hinged to the handle of the shaver."

13, 1941, on the ground that plaintiff's patent was invalid. It was also found by the court that plaintiff disclosed, at defendant's request, copies of two pending applications, Nos. 314,287 and 316,154, for United States Letters Patent owned by plaintiff which were confidential and secret. Plaintiff complied therewith in reliance upon the oral contract and at the inducement of defendant, thereby changing his position to his detriment. Further he refrained from negotiations with any third parties as to the patent in suit, believing he had an enforceable contract. However, the trial court found that these patent applications were not solely referable to the oral contract as it was not provided by the contract that plaintiff submit or disclose them to defendant. It was concluded that the contract was within the statute of frauds as being an agreement which could not be performed within a year. California Civil Code § 1624 and California Code of Civil Procedure § 1973. Nor was the defendant estopped from asserting the statute of frauds because it was held that submitting the applications was not an act solely referable to the contract, nor was plaintiff's forbearance from negotiations with others an admission solely referable to the oral contract.

On his cross-appeal, Jones contends that the court erred because the contract was fully performed when he granted to Schick the exclusive license as nothing remained to be done thereunder but payment of royalties by Schick, thereby taking it outside of the statute of frauds. Secondly, the court erred because Jones changed his position to his detriment by relying on the contract, acting at the inducement of Schick which equitably estopped Schick to rely upon the statute of frauds. Jones urges that "the action of the defendant Schick, Inc., trading on plaintiff's belief in the existence of the royalty contract, inducing plaintiff to reveal to it confidential and secret information contained in his pending patent applications (which plaintiff would not otherwise have done) is morally indefensible. It is submitted that ordinary business ethics required that, if the defendant corporation did not intend to abide by its royalty contract with plaintiff, it should have so

notified him at the time that it requested him to make such disclosures. This defendant wholly failed to do so (sic). It is therefore submitted that plaintiff's disclosure of his two secret and pending patent applications to defendant Schick, Inc., and the fact that he forbore negotiating with others with regard to his patent No. 2,228, 768 both at defendant's inducement, and in reliance upon the enforceability of his oral contract, constituted such a change of position by plaintiff as to equitably estop defendant Schick, Inc., from relying upon the Statute of Frauds as a defense."

Schick urges that the cause of action based on the oral contract should have been dismissed because of inconsistency with the first cause of action, i. e., he cannot have judgment for infringing a patent and at the same time recover royalties pursuant to a license under the patent. Secondly, the lower court erred in its findings on the contract as not supported by the evidence in that no contract was ever consummated, it was incomplete, and it was intended to be reduced to writing. Thirdly, that the court correctly concluded that the contract was not fully or otherwise performed. Schick further claims that the lower court erred in finding the contract terms to have been unconditionally agreed to without the need of further negotiations, because it was agreed that the contract was to be put into writing, that Schick draw up the agreement and that Jones send any suggestions or points he wished to be included, which would be done if possible. A number of letters were written back and forth in regard to the contemplated written version of the contract. After submitting a written memorandum to its board of directors, Schick wrote Jones that they were not interested in obtaining the license. Their patent counsel wrote to him on the same day saying that in view of the prior art there could be no infringement of the patent.

Schick argues that the evidence is insufficient to support a finding of any license agreement; that if it did come into existence, it was barred by the statute of frauds, because the acts claimed by Jones to create estoppel were not acts referable to the con-

tract, that there is no evidence that such acts caused him detriment or change of position; that Jones' patent is invalid which defense is available to Schick in respect of the second cause of action, because Schick renounced the agreement and the protection thereby, placing itself in the position of an infringer, if validity be sustained; and that the oral agreement is barred by the statute of limitations, and that California Code of Civil Procedure, § 339(1) is a bar to any recovery under the alleged agreement.

■ The contract was clearly within the statute of frauds and unenforceable. There was no memorandum of an oral contract, nor was there performance by Jones so as to take it out of the operation of the statute of frauds. The findings of the lower court that the acts of Jones in sending the patent applications were not referable to the contract and thus did not constitute such performance as would take the contract outside of the statute, is supported by the evidence. The Judge stated: "I further find that it was not one of the terms or provisions of the oral agreement sued upon and found to have been made that the plaintiff would submit those applications or disclose them to the defendant Schick, Inc. I further find that those applications are not involved in the oral agreement for an exclusive license which the parties made on January 29, 1941. I further find that the plaintiff, in disclosing the secret applications for the United States Letters Patent, thereby changed his position and did so to his detriment, and I conclude that the act of submitting those two applications did not constitute a partial performance of the contract and was not an act solely referable to the contract sued upon, and it is not, for that reason, an act of conduct which would estop the defendant Schick, Inc., from pleading the statute of frauds as a defense. In other words, it did not estop Schick, Inc., from asserting the invalidity of the contract pursuant to Section 1624 of the California Civil Code." In Baker v. Bouchard, 122 Cal.App. 708, at page 711, 10 P.2d 468, at page 469, the requirement that acts be referable to the contract is clearly expressed: "Further-more, it is clear that, in order to take a contract out of the operation of the statute of frauds, the acts relied upon as establishing part performance must be unequivocally referable to the contract."

■ The court found that equitable estoppel was not so present as to prevent Schick from claiming the statute of frauds as a defense. It was determined that, although Schick induced Jones to send it the pending applications and that Jones relied upon the oral agreement in sending them, thereby changing his position to his detriment, since he could not be returned to a position of non-disclosure, and the fact that he refrained from negotiating with any other person as to the patent in suit thereby suffering further detriment, the patent applications were not solely referable to the oral contract since the terms thereof did not require that Jones submit the applications or disclose them to Schick, Inc., nor was his forbearance from negotiations with others an omission referable to the oral contract. Since the patent is invalid and therefore not infringed, it is hard to see how Jones suffered any detriment in forbearance of other negotiations. We do not agree with Jones that he has so changed his position in relation to the contract concerning the patent in suit as to incur unjust and unconscionable injury and loss, and if no loss or injury be present the reason for estoppel fails. Standing v. Morosco, 43 Cal.App. 244, 184 P. 954; Zellner v. Wassman, 184 Cal. 80, 193 P. 84. It has also been held by the California courts that a trial court has considerable discretion in determining the application of equitable estoppel, and an appellate court should not interfere in absence of abuse of discretion. Flint v. Giguiere, 50 Cal.App. 314, 195 P. 85. There was no contract in relation to the pending applications which Jones disclosed to Schick and no requirement causing him to make disclosures in reliance thereon. Such action on his part was not in pursuance or related to the oral contract. There was no basis, as found by the trial court, for the equitable estoppel.

■ Jones claims that a change of position need not be in part performance

of the contract if that change of position is detrimental and in reliance upon enforceability of the oral contract and at the inducement of the party sought to be charged. However, the change of position must arise out of or be related to the terms of such a contract—and here it did not.

██ Jones further contends that those claims held invalid for indefiniteness under 35 U.S.C.A. § 33 are definite and valid as a matter of law, and are inventive; no evidence of indefiniteness was presented and, further, the Schick company had no difficulty in understanding them sufficiently to make up a model based thereon. The trial judge found a lack of invention as well as indefiniteness, and we are of the opinion that there was such a lack and that the claims were properly held to be invalid.

Affirmed in part and reversed in part.